# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| ONE DIGITAL DEVICE LOCATED IN THE | ) | Case No. 24-sw-338 |
| DISTRICT OF COLUMBIA UNDER RULE 41 | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the ___Jurisdiction of the___ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 201 | Bribery |
| 18 USC § 1343 | Honest Services |
| 18 USC §1346 | Wire Fraud |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Mackenzie Metcalfe, Special Agent USAID OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: ___10/29/2024___

_____
*Judge's signature*

City and state: ___Washington, D.C.___

Moxila A. Upadhyaya, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| ONE DIGITAL DEVICE LOCATED IN THE | )   Case No. 24-sw-338 |
| DISTRICT OF COLUMBIA UNDER RULE 41 | ) |
| | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of ____Columbia____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before ____November 12, 2024____   *(not to exceed 14 days)*
☐  in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ____Moxila A. Upadhyaya____
                                                                                                     *(United States Magistrate Judge)*

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
    ☐  for _____ days *(not to exceed 30)*   ☐  until, the facts justifying, the later specific date of _____ .

Date and time issued:    ____10/29/2024____

City and state:   __Washington, D.C.__          _____
                                                              *Judge's signature*

                                                              Moxila A. Upadhyaya, U.S. Magistrate Judge
                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  24-sw-338 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is a Galaxy S23 Ultra Android Phone bearing IMEI number 353130606143775, hereinafter, "TARGET DEVICE." TARGET DEVICE is currently stored by the U.S. Agency for International Development Office of Inspector General (USAID/OIG), located at 1300 Pennsylvania Avenue NW Washington, D.C. 20004.

## ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to the commission of bribery and honest services wire fraud, in violation of 18 U.S.C. §§ 201, 1343, 1346 (the "TARGET OFFENSES") as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

   a.   Establishing or documenting the commission of the TARGET OFFENSES;

   b.   Identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

   c.   Reflecting the ownership and use of the item identified in Attachment A by the individual committing the TARGET OFFENSES;

   d.   Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

   e.   Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

   f.   Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES, to include photographs or videos of: co-conspirators; matters related to government contracts; bank and financial records; and discussions or depictions of the commission of one or more of the TARGET OFFENSES;

h.  Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the TARGET OFFENSES; and

i.  Any records and information relating to co-conspirators; government contracts; bank and financial records; and discussions of the commission of one or more of the TARGET OFFENSES.

j.  Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

k.  Evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

l.  Evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

m.  Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

n.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

o.  Evidence of the times the Device(s) was used;

p.  Passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

q.  Documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

r.  Records of or information about Internet Protocol addresses used by the Device(s); and

s.  Records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ONE DIGITAL DEVICE LOCATED IN THE DISTRICT OF COLUMBIA UNDER RULE 41** | **24-sw-338**<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Mackenzie Metcalfe, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, a Galaxy S23 Ultra Android Phone bearing IMEI number 353130606143775, (hereinafter, the "TARGET DEVICE"), as described in Attachment A that is currently in the possession of the U.S. Agency for International Development Office of Inspector General (USAID/OIG), located at 1300 Pennsylvania Avenue NW, Washington, D.C. Such a search would include an examination of the seized device for information described in Attachment B.

2.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.     Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

4.     I, Mackenzie Metcalfe, being first duly sworn, hereby depose and state as follows:

5.     I am employed as a Special Agent with the U.S. Agency for International Development Office of Inspector General (USAID/OIG) assigned to the Middle East and Africa Division and work in New York, New York.   I have been employed at USAID/OIG since August 2017 as an Investigative Analyst and have been a Special Agent since October 2020.

6.     I hold a bachelor's degree in political science and intelligence and security studies from the University of Mississippi.  I hold a master's in criminal justice from the University of Mississippi.  I have received training from the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, and formal and informal training regarding white-collar crime, including wire fraud, mail fraud, advanced interviewing, money laundering, and structuring offenses. During my career, I have conducted and assisted in numerous criminal investigations focused on international procurement and financial fraud targeting projects and programs overseas. In the course of my duties, I have interviewed witnesses, informants, and subjects; analyzed financial records and digital records, to include email records and electronic communications; collected and processed evidence; and assisted in preparing and executing digital and physical search warrants. Through my training and experience, I have become familiar with the methods and techniques used by criminals to commit financial crimes, particularly by email and electronics, and how those criminals conceal and store information and assets related to and derived from such criminal activity, including but not limited to email accounts and bank accounts.

7.     As such, I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

8.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

9.     Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 201, 1343, 1346 (the "TARGET OFFENSES") has occurred. There is also probable cause to search the TARGET DEVICE, further described in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

10.     The property to be searched is a Galaxy S23 Ultra Android Phone bearing IMEI number 353130606143775 (the "TARGET DEVICE"). The TARGET DEVICE is currently in the possession of USAID/OIG, located at 1300 Pennsylvania Avenue NW, Washington, D.C.

## PROBABLE CAUSE

### *U.S. African Development Foundation Investigation*

11.     The U.S. African Development Foundation ("USADF") is an independent U.S. government agency established by Congress to invest directly in African grassroots enterprises and social entrepreneurs.  USADF is headquartered in Washington, DC.  USAID/OIG serves as the office of inspector general for USADF, which authorizes USAID/OIG to supervise, direct, and control audit and investigative activities relating to all aspects of USADF programs and operations worldwide.

12.    USAID/OIG received allegations of misconduct involving USADF senior officials, including that USADF senior officials were abusing their positions and authorities and misusing USADF funds. Some of the allegations related to sole-source contracts USADF awarded to Ganiam, Ltd. ("Ganiam"), a Kenyan company headquartered in Nairobi, Kenya.  A sole-source contract is a type of contract that allows an agency to contract with a specific company instead going through a competitive bidding process. An agency must justify the need to sole-source a contract instead of going through the competitive bidding process.

13.    In January 2024, USAID/OIG agents conducted a voluntary interview of Mathieu Zahui, USADF's chief financial officer ("CFO"), at USADF's headquarters in Washington, DC. Zahui is assigned to and works from USADF's headquarters in Washington, DC.  As CFO, Zahui oversees various business functions at USADF including the agency's finances, procurements, human resources, and information technology.

14.    In his interview, Zahui stated that USADF awarded sole-source contracts to Ganiam, a Kenyan company owned by Maina Gakure.  Zahui stated that he first met Gakure around 1999 at a VA hospital in San Diego when Zahui worked at the Department of Veterans Affairs. Zahui stated that Gakure moved from San Diego to the D.C. area and that he had been to Gakure's apartment in the DC area.  Zahui's understanding was that Gakure later moved from the DC area to Kenya to work in real estate. Zahui stated that, prior to Ganiam's contract with USADF, he would speak with Gakure maybe two or three times a year.

15.    Zahui stated that the contracting process for the contract that was ultimately awarded to Ganiam began in 2019.  Zahui explained that USADF was looking to contract with a company in Africa to perform certain travel logistic services that could not be performed by

USADF domestically. Zahui called Gakure to ask him if he knew of any companies that could provide these services. According to Zahui, Gakure told Zahui that he could provide the services.

16.     USADF awarded the contract to Ganiam as a sole-source contract. Zahui stated that his office was responsible for determining which contracts should be sole-sourced. Zahui, however, could not explain why the contract with Ganiam was sole-sourced instead of being competitively bid.

17.     Zahui stated that when the sole-source contract with Ganiam was finally executed on March 9, 2020, USADF-related travel was not happening due to the COVID-19 pandemic. At the same time USADF was moving to remote work, which Zahui stated the agency was not prepared to do. Zahui stated that, instead of having Ganiam provide logistical support services, they asked Ganiam to assist USADF develop their IT infrastructure to allow staff to better work remotely. Zahui stated that Ganiam did not have expertise in IT support, but that Ganiam sub-contracted the services.

18.     USADF utilized the Bureau of Fiscal Services (BFS) to assist with the awarding of the sole-source contract to Ganiam. BFS is an agency within the US Department of Treasury that is headquartered in Washington, DC, that supports federal agencies with professional accounting, information technology, administrative and financial management services. The lead contracting officer at BFS serving USADF was interviewed by USAID/OIG agents in May 2024. He stated that it would have been improper to re-classify the contract with Ganiam from a logistical support contract to a technical support contract without notifying BFS and amending the contract's scope of work. It also would have been improper for Ganiam to subcontract out the work.

19.     After the first sole-source contract with Ganiam expired, USADF awarded Ganiam additional sole-source contracts to provide logistical services. Zahui characterized the decision to

continue to sole-source these contracts instead of competitively bidding them as "lazy work" – stating that Ganiam was already doing the work and should just continue doing it.

20.     Zahui stated that he did not receive any direct or indirect benefits from Gakure.

### *Seizure of the Target Device*

21.     In February 2024, USAID/OIG agents conducted a second voluntary interview with Zahui.  During this interview, USAID/OIG agents took possession of Zahui's government issued work cell phone.  This device, the TARGET DEVICE, is currently located in the evidence vault at the USAID/OIG office at 1300 Pennsylvania Avenue NW Washington, DC. According to USADF's Mobile Device Policy, dated April 18, 2018:

> Government employees do not have a right, nor should they have an expectation of privacy while using Government provided devices at any time, including accessing the Internet and using e-mail and voice communications.  To the extent that employees wish that their private activities to remain private, they should avoid using the Government provided device for limited personal use.  By acceptance of the government provided device, employees imply their consent to disclosing and/or monitor of device usage, including the contents of any files or information maintained or passed through that device.

22.     Zahui told the USAID/OIG agents that he also used the government issued work cell phone, the TARGET DEVICE, as his personal cell phone.  USAID/OIG agents asked Zahui to list the applications on the phone that he used for official USADF work purposes – Zahui identified Microsoft Teams, Outlook, authenticator token, text messaging, and phone calls.  Zahui also stated that he used his personal email account for work purposes.  Zahui was asked to provide, and did voluntarily provide, a passcode for the TARGET DEVICE.

23.     From May 2024 to August 2024, USAID/OIG agents reviewed the TARGET DEVICE.  The agents only reviewed the application that Zahui stated he used for official USADF work.  During their review, agents found text messages showing at least eight instances of wire transfers or electronic payments from Gakure to Zahui's Bank of America account, totaling over

$10,000. These payments coincide with USADF's awarding of sole-source contracts to Ganiam. The payments were as follows:

24.     USADF awarded a $173,640 sole-source contract to Ganiam on March 9, 2020. USAID/OIG agents found a text message on the TARGET DEVICE showing that Gakure sent Zahui a $1,000 payment on April 29, 2020. The contract was for the period March 9, 2020, to September 9, 2020, but was later modified to extend to March 9, 2021.

25.     USADF awarded a $175,902 sole-source contract to Ganiam on March 15, 2021. USAID/OIG agents found text messages on the TARGET DEVICE showing that Gakure sent Zahui a $2,500 payment on April 23, 2021; a $2,500 payment on April 24, 2021; a $1,000 payment on July 22, 2021; and a $3,000 payment on August 20, 2022.  The contract was for the period March 15, 2021, to March 14, 2022, but was but later modified to extend to March 14, 2023.

26.     A text message on the TARGET DEVICE shows that Ganiam sent Zahui $1,000 on April 9, 2023. USADF awarded a $93,200 sole-source contract to Ganiam on June 27, 2023. The contract was for the period June 27, 2023, to December 26, 2023.

27.     After identifying these payments, the agents stopped their review.  Based on the aforementioned evidence, there is probable cause to believe that there are additional relevant communications and instances of payments on the TARGET DEVICE in the applications that have not been reviewed by law enforcement.

## THE TARGET DEVICE

28.     I have experience investigating the statutes underpinning probable cause.  Evidence of bribes and honest services wire fraud, such as communications and electronic fund transfers between the briber and a public official, can often be found on cell phones like the TARGET

DEVICE.  The TARGET DEVICE may also provide evidence of co-conspirators and other fruits and instrumentalities of the TARGET OFFENSES.

29.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

30.     Here, Zahui, a public official, stated that he knew and kept in contact with Gakure since 1999, including having been to Gakure's apartment in the DC area.  Zahui reached out to Gakure when USADF first decided to issue a contract for logistical support. He further stated that his office was responsible for deciding which USADF contracts were sole-sourced, but could not explain why USADF awarded a sole-source to Gakure's company, Ganiam.  Zahui claimed that he never received any direct or indirect benefits from Gakure. The text messages found on the TARGET DEVICE contradict Zahui's claims and show electronic fund transfers from Ganiam and Gakure to Zahui.  These electronic fund transfers were all made shortly before or after USADF awarded sole-source contracts to Ganiam.  Zahui's longstanding personal relationship with Gakure outside of his work at USADF makes it more likely than not that there are communications with Gakure on the TARGET DEVICE – particularly since Zahui stated that he uses the TARGET DEVICE for both personal and work-related purposes. Based on all these facts, there is probable cause to believe that additional evidence, fruits, or instrumentalities of the TARGET OFFENSES can be found on the TARGET DEVICE including in Microsoft Teams, Microsoft Outlook, Messages, Phone, Pictures, Entrust Identity and/or authenticator tokens, Google, and Gmail. USAID/OIG agents conducted keyword searches from the TARGET DEVICE that yielded some

results in messaging platforms.  USAID/OIG agents have additional searches to conduct on these applications and others.

31.     Your affiant knows that cellular phones, like the TARGET DEVICE, are relevant because they may contain evidence of the TARGET OFFENSES, such as relevant communications and fund transfers – like the communications and fund transfers from Ganiam and Gakure to Zahui that were already found on the TARGET DEVICE.

32.     Your affiant knows that cellular telephones contain valuable information and evidence relating to bribery and honest services wire fraud. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of bribery and honest services wire fraud; (ii) identify locations relevant to bribery and honest services wire fraud; (iii) reflect the ownership and use of the cellular telephones by persons involved in the commission of bribery and honest services wire fraud; (iv) document meetings and communications between associates, and co-conspirators of bribery and honest services wire fraud; (v) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband relating to bribery and honest services wire fraud; and (viii) document or contain evidence of the purchase of items or the assets derived from bribery and honest services wire fraud.

33.     In summation, the execution of a search warrant on the TARGET DEVICE would allow law enforcement to, among other things: uncover additional evidence, fruits, and instrumentalities of bribery and honest services wire fraud. Additionally, evidence from the TARGET DEVICE may yield ownership information of the TARGET DEVICE. All of the

aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES.

## TECHNICAL TERMS

34.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets

function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software

or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

       g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon

the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

       j.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

       k.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

       l.     "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example,

www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

o.      "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

35.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

A.      Individuals who engage in criminal activity, including bribery and honest services wire fraud, use digital devices, like the Device, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device, documents and records relating to their illegal activity, which can include logs of online

chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation. As described above, and incorporated by reference here, USAID/OIG agents found text messages showing fund transfers between Gakure and Ganiam to Zahui that were sent shortly before or after USADF awarded sole-source contracts to Ganiam.

      B.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      C.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until

it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

36.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

A.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who

has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

B.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated

with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

C.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

D.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

F.      I know that when an individual uses a digital device to commit bribery and honest services wire fraud, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my

training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

37.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

A.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

B.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic

files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

C.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

D.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend

themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      E.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance

from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

F.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

38.    The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

A.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

       i.     Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICE to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and

appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

       ii.       The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

       iii.       In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques

or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

39.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET DEVICE contains evidence of the TARGET OFFENSES.

40.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

41.     I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICE is contained on the premises of USAID/OIG.

Respectfully submitted,

_____
Mackenzie Metcalfe, Special Agent
USAID/OIG

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) this 29th day of October, 2024.

_____
Honorable Moxila A. Upadhyaya
United States Magistrate Judge